# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **CRIMINAL ACTION** |
| v. ) | |
| ) | **No. 11-20111-01-KHV** |
| DANA J. HUFF, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant's Motion To Suppress Evidence (Doc. #34) filed October 11, 2012. On December 6, 2012, the Court held a hearing on defendant's motion. For reasons stated below, the Court sustains defendant's motion.

## Factual Background

Based on the testimony at the hearing on defendant's motion to suppress, the Court finds the following facts:

Late in the evening on June 1, 2011, Officers Christopher O'Neill and Brad Lancaster of the Kansas City, Kansas Police Department were on routine patrol when they observed a gray 1995 Isuzu Rodeo stopped in the wrong lane (left of the center stripe) on Armstrong near 5th Street. Defendant was driving the vehicle and Jarvon Williams was in the front passenger seat. After a few seconds, officers saw the vehicle back up and move into the correct lane. The vehicle turned north onto 5th Street. The officers activated their emergency lights and conducted a traffic stop because of the observed traffic violation.

Officer O'Neill approached the vehicle on the driver's side and Officer Lancaster approached the vehicle on the passenger side. While using a flashlight to look through a side window on the

right side of the car, Officer Lancaster saw a handgun in plain view protruding from underneath the back of the driver's seat. Officer Lancaster used the radio code "Signal 1" to alert Officer O'Neill and dispatch that the occupants were armed and dangerous. The officers directed the occupants of the vehicle to place their hands on the dash. Because defendant appeared to be moving his hands back and forth and they were near the gear shift, Officer Lancaster opened the passenger door, leaned into the car and removed the keys from the ignition. While doing so, Officer Lancaster saw a second firearm, a rifle, which was between Williams and the center console.[1] As soon as Williams realized that Officer Lancaster had seen the rifle, Williams spontaneously said "he [the driver] put it on my lap." The officers directed defendant and Williams to exit the vehicle, handcuffed them and placed them in the back of the patrol car. Officers then arrested defendant and Williams.[2]

Defendant seeks to suppress evidence of the two firearms which officers found in his vehicle. Based on his motion and argument at the hearing, defendant asserts that (1) officers "unlawfully arrested" him without a warrant and without probable cause to believe that he had committed a crime, Motion To Suppress (Doc. #34) at 1, (2) officers unlawfully searched his vehicle because they

---

[1] In its response brief, the government asserts that this firearm was a 7.5 mm MAS rifle, Model 1936-51, serial number F37625, which had a barrel of less than 16 inches in length. At the hearing, however, the government did not present any evidence as to the length of the rifle or its barrel. In questions directed to Officer Lancaster, defendant referred to the rifle as 22 inches in length. Government counsel also referred to the firearm as a short-barrel rifle, but Officer Lancaster did not specifically testify on this issue.

[2] In its response brief, the government asserts that (1) the "driver was asked for identification, but advised he had no driver's license or other identification," (2) defendant then told the officers his name was Dana Huff and (3) officers "quickly determined he was a convicted felon, after having been convicted of aggravated robbery in 2010." Government's Response (Doc. #47) at 2. The government presented no evidence to support these factual assertions. At the hearing, Officer Lancaster testified that Officer O'Neill spoke with defendant. Officer O'Neill did not testify at the hearing.

lacked reasonable suspicion of criminal activity and before they asked defendant for his license and registration, id., and (3) officers unlawfully arrested him when they handcuffed him and placed him in the back of the police car while they searched the vehicle, id. at 1-3.

## **Analysis**

### I.  **Traffic Stop**

The Fourth Amendment of the United States Constitution protects persons and their houses, papers and effects against unreasonable searches and seizures. See U.S. Const. amend. IV. The Tenth Circuit has defined three categories of police/citizen encounters: (1) voluntary cooperation in response to non-coercive questioning; (2) investigatory; and (3) arrest. United States v. Muldrow, 19 F.3d 1332, 1335 (10th Cir.), cert. denied, 513 U.S. 862 (1994); see Terry v. Ohio, 392 U.S. 1 (1968). This case involves the second category: an investigatory or Terry stop. See United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005) (traffic stops are seizures analogous to investigative detentions).

A traffic stop constitutes a seizure for purposes of the Fourth Amendment "even though the purpose of the stop is limited and the resulting detention quite brief." Brendlin v. California, 551 U.S 249, 255 (2007) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)). In deciding whether an investigatory detention is permissible, the Court must determine both "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. Law enforcement officers may stop and briefly detain a person for investigative reasons if the officer has a reasonable suspicion that criminal activity may be afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989). Reasonable suspicion requires a "particularized and objective basis for suspecting the particular person stopped

of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981).

After an officer resolves the concern that justified the initial stop, any further detention must be supported by a reasonable suspicion of criminal activity. See United States v. Alarcon-Gonzalez, 73 F.3d 289, 292-93 (10th Cir. 1996). Thus, "reasonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout." United States v. Soto-Cervantes, 138 F.3d 1319, 1322 (10th Cir.), cert. denied, 525 U.S. 853 (1998). "Specific and articulable facts" are necessary to support a finding of reasonable suspicion; an inchoate and unparticularized suspicion or hunch is inadequate. Terry, 392 U.S. at 21. In determining whether reasonable suspicion existed, the Court considers the totality of the circumstances, Sokolow, 490 U.S. at 8, including the collective knowledge of those officers involved in the investigation, United States v. Hinojos, 107 F.3d 765, 768 (10th Cir. 1997). The Court evaluates the officers' conduct "in light of common sense and ordinary human experience," deferring to "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." United States v. Stephenson, 452 F.3d 1173, 1176 (10th Cir. 2006) (internal quotation marks and citations omitted). The government bears the burden of proving the reasonableness of the officers' suspicion. United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998).

The decision to stop an automobile is reasonable where law enforcement officers have probable cause to believe that a traffic violation has occurred. Whren v. United States, 517 U.S. 806, 810 (1996); Prouse, 440 U.S. at 659; see United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (traffic stop valid if based on observed traffic violation), cert. denied, 518 U.S. 1007 (1996). Here, Officers Lancaster and O'Neill stopped defendant's vehicle because they saw a traffic

violation.[3] The officers therefore had probable cause to stop defendant's vehicle.

**II.     Temporary Seizure Of Firearms For Officer Safety Concerns**

Defendant argues that before officers asked for his license and registration, Officer Lancaster unlawfully searched the vehicle when he leaned into the vehicle to remove the keys from the ignition. Traffic stops are especially fraught with danger to police officers. Arizona v. Johnson, 555 U.S. 323, 330 (2009); Michigan v. Long, 463 U.S. 1032, 1047 (1983). During an investigative detention, police officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo. United States v. Garcia, 459 F.3d 1059, 1063 (10th Cir. 2006); United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998). The risk of harm to police and occupants of a stopped vehicle is minimized if officers routinely exercise unquestioned command of the situation. Johnson, 555 U.S. at 330. Once a motor vehicle has been lawfully detained for a traffic violation, police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures. Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977) (per curiam). The government's "legitimate and weighty" interest in officer safety outweighs the "de minimis" additional intrusion of requiring driver and any passengers, already lawfully stopped, to exit the vehicle. Id. at 110-111; Maryland v. Wilson, 519 U.S. 408, 415 (1997) (officer making traffic stop may order passengers to get out of car pending completion of

---

[3]     After an officer observes a traffic violation, his subjective motivations for stopping the vehicle or conducting a stop are not relevant to the Fourth Amendment inquiry. See United States v. Rubalcava-Roacho, No. 07-3362, 2008 WL 4874186, at *3 (10th Cir. Nov. 12, 2008) (after officer observes traffic violation, subjective motivations for following vehicle or conducting stop have no bearing on Fourth Amendment reasonableness inquiry), cert. denied, 129 S. Ct. 1649 (2009); United States v. Cervine, 347 F.3d 865, 870 (10th Cir. 2003) (traffic violation provided troopers reasonable suspicion to stop car; other motivations not relevant); see also Whren, 517 U.S. at 813 (subjective intentions play no role in ordinary probable cause analysis).

stop). Once outside the stopped vehicle, a driver and any passengers may be patted down for weapons if the officer reasonably concludes that the driver "might be armed and presently dangerous." Mimms, 434 U.S. at 112; see Johnson, 555 U.S. at 332 (officers who conduct routine traffic stops may perform patdown of driver and any passengers upon reasonable suspicion that they may be armed and dangerous); Garcia, 459 F.3d at 1063 (officer need not be absolutely certain that individual is armed before taking protective measures, but must harbor articulable and reasonable suspicion that person is armed and dangerous).

Here, based on Officer Lancaster's observation of a firearm in plain view behind the driver's seat, he had an articulable and reasonable suspicion that defendant and the passenger were armed and dangerous. Officer Lancaster testified that after he saw the firearm behind the driver's seat, he tried to "secure the scene" right away.[4] Because Officer Lancaster reasonably believed that defendant might try to drive away, he opened the passenger door, leaned into the car and removed the keys from the ignition. Considering the totality of the circumstances, the Court concludes that Officer Lancaster's decision to remove the keys was reasonably necessary to secure officer safety and assume unquestioned command of the situation.[5] See Johnson, 555 U.S. at 330; Garcia, 459 F.3d 1059, 1063; see also United States v. Townsend, 206 Fed. Appx. 444, 449 (6th Cir. 2006) (seizure of car keys from ignition was minimal intrusion, reasonable and prudent safety precaution for

---

[4] Defendant maintains that the officers unlawfully searched the vehicle before they asked him for his license and registration. After Officer Lancaster saw the first firearm, he reasonably decided to "secure the scene" before asking defendant for his license and registration.

[5] With the benefit of hindsight and outside the rapidly evolving context of the traffic stop, the Court assumes that most officers would first try to secure a driver's voluntary compliance before personally trying to remove the keys from the ignition.

defendant who did not respond to verbal inquiry and handgun was in plain view). The officers lawfully seized the two firearms for safety concerns pending further investigation.

**III.    Arrest Of Defendant**

A warrantless arrest is justified if officers have probable cause to believe a person is committing or has committed a crime.[6]   United States v. Madden, 682 F.3d 920, 926 (10th Cir. 2012). The government bears the burden to establish probable cause in support of a warrantless arrest. Romero v. Fay, 45 F.3d 1472, 1476 n.1 (10th Cir. 1995).

Here, officers arrested defendant and Williams when they put them in the back of the police vehicles,[7] but the record does not reflect that at that point, officers had evidence that defendant or Williams had violated any law. From the meager evidence presented at the hearing, the Court can only conclude that officers arrested defendant and Williams for officer safety concerns and in an effort to "secure the scene."[8] Although the officers could temporarily seize both firearms for safety concerns, before they could arrest both individuals and retain possession of the firearms, they needed probable cause to believe that defendant and/or Williams had committed a crime. The record does not reflect that officers questioned defendant or Williams about the firearms before they arrested

---

[6]    A traffic violation such as the one observed in this case is insufficient to justify an arrest. See K.S.A. 22-2401(d) (except for traffic, cigarette or tobacco infractions, officer may arrest individual who commits crime in his presence).

[7]    A detention ceases to be a Terry stop and becomes an arrest if it continues for an excessive time or closely resembles a traditional arrest. Morris v. Noe, 672 F.3d 1185, 1192 (10th Cir. 2012) (citing Hiibel v. Sixth Judicial Dist. Ct. of Nev., 542 U.S. 177, 186 (2004)).

[8]    Officer Lancaster testified that because of the presence of firearms, he secured the scene by taking defendant and Williams into custody. Officer Lancaster testified that officers are trained to "secure the scene," take the parties into custody, recover the weapons and then investigate from that point. The government presented no evidence of any "investigation" after the officers found the firearms.

them.

The government appears to assume that at the time of arrest, officers knew that defendant was a convicted felon who could not lawfully possess a firearm. As noted above, the government asserts that (1) the "driver was asked for identification, but advised he had no driver's license or other identification," (2) defendant then told the officers his name was Dana Huff and (3) officers "quickly determined he was a convicted felon, after having been convicted of aggravated robbery in 2010." Government's Response (Doc. #47) at 2. At the hearing on defendant's motion, however, the government presented no evidence to support these factual assertions. In his motion to suppress, defendant specifically alleged that "[a]ll information regarding identity was taken at the Wyandotte County Jail." Motion To Suppress (Doc. #34) at 3. The government offered no evidence to establish that before officers arrested defendant, they knew that he was a convicted felon.

The officers possibly could have arrested defendant and Williams if they had probable cause to believe that the individuals possessed an unregistered rifle with a barrel of less than 16 inches in length, see 26 U.S.C. §§ 5845(a), 5861(d), but the government again did not raise this possible justification in its response brief or offer any evidence to support such a conclusion. The record does not reflect that (1) officers thought that the rifle was subject to federal registration requirements or (2) officers asked defendant and/or Williams if they had a permit for the rifle before they arrested them. Accordingly, the Court cannot uphold the arrest of defendant on this ground.

In sum, the government has not satisfied its burden to show that the officers had probable cause to believe that defendant was committing or had committed a crime. Absent probable cause to arrest defendant or Williams, the officers were required to return the two firearms and allow the individuals to proceed. Because the government has not established that the officers lawfully

arrested defendant, the Court must suppress evidence of the two firearms which they retained from the traffic stop.[9]

**IT IS THEREFORE ORDERED** that defendant's Motion To Suppress Evidence (Doc. #34) filed October 11, 2012 be and hereby is **SUSTAINED**.

Dated this 4th day of January, 2013 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge

---

[9] The inevitable discovery doctrine allows the introduction of evidence acquired in violation of a defendant's Fourth Amendment rights if the evidence would have been inevitably discovered through independent legal means. United States v. Griffin, 48 F.3d 1147, 1150 (10th Cir. 1995); see United States v. White, 326 F.3d 1135, 1138 (10th Cir. 2003). The prosecution must show by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means. Nix v. Williams, 467 U.S. 431, 444 (1984). Accordingly, as long as "an independent investigation inevitably would have led to discovery of the evidence," the evidence will not be suppressed. United States v. Larsen, 127 F.3d 984, 986 (10th Cir. 1997). The Court considers demonstrated historical facts, not speculative elements. White, 326 F.3d at 1138.

Here, the government did not raise the inevitable discovery doctrine. In any event, the government presented no evidence that an independent lawful investigation would have led to the discovery that defendant did not lawfully possess the firearms. See United States v. Lopez-Soto, 205 F.3d 1101, 1107 (9th Cir. 2000) (district court erred in sua sponte applying inevitable discovery exception because government did not present evidence that by following routine procedures, police would inevitably have uncovered evidence).